KRISTA L. BAUGHMAN (SBN: 264600)
kbaughman@dhillonlaw.com
HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
JESSE FRANKLIN-MURDOCK (SBN: 339034)
jfranklin-murdock@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

Attorneys for Plaintiff
JOHN STOSSEL

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **JOHN STOSSEL**, an individual, <br><br> Plaintiff, <br> v. <br><br> **META PLATFORMS, INC.**, a Delaware corporation; **SCIENCE FEEDBACK**, a French non-profit organization; and **CLIMATE FEEDBACK**, a French non-profit organization, <br><br> Defendants. | Case Number: 5:21-cv-07385-VKD <br><br> **PLAINTIFF JOHN STOSSEL'S OPPOSITION TO DEFENDANT META PLATFORMS, INC.'S MOTION TO DISMISS THE COMPLAINT AND SPECIAL MOTION TO STRIKE COMPLAINT UNDER CALIFORNIA'S ANTI-SLAPP STATUTE** <br><br> Judge: Hon. Virginia K. DeMarchi <br> Courtroom 2 – 5th floor <br> Date: April 12, 2022 <br> Time: 10:00 a.m. |



Opposition to Motions to Dismiss and Strike                    Case No. 5:21-cv-07385-VKD

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ........................................................................................................... 2

  A.      THE PARTIES ................................................................................................... 2

  B.      THE FIRE VIDEO ............................................................................................. 3

  C.      THE ALARMISM VIDEO ................................................................................ 4

III. LEGAL STANDARDS ............................................................................................... 4

IV. ARGUMENT ............................................................................................................... 5

  A.      STOSSEL HAS PLED A VIABLE DEFAMATION CLAIM ........................... 5

    1.    Section 230 of the Communications Decency Act Does Not Bar Stossel's Claim ................. 5

      a.    Section 230(c)(1) immunity does not apply because the alleged defamation was jointly developed by Meta .................................................................... 5

      b.    Section 230(c)(1) immunity does not apply because the alleged defamation is attributable to Meta ............................................................................ 7

      c.    Meta has no immunity under CDA Section 230(c)(2) ........................................ 9

    2.    Stossel Has Sufficiently Pled all Elements of His Defamation Claim ................................. 11

      a.    Stossel has adequately pled actual malice ......................................................... 11

      b.    Stossel has sufficiently pled falsity, and no protected opinion defense applies ................. 13

  B.      THE COURT SHOULD DENY META'S ANTI-SLAPP MOTION ................................. 15

    1.    Legal Standards ............................................................................................... 15

    2    Meta Can Only Seek Shelter Under the anti-SLAPP Statute If It Engaged in Speech .......... 16

    3.    Stossel Has Demonstrated a Probability of Success on the Merits Under the Second Anti-SLAPP Prong ................................................................................ 18

V. CONCLUSION ............................................................................................................. 19



---

1

## TABLE OF AUTHORITIES

2

**Cases**

3
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). ........................................................................ 4

4
*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) ...................................................... 10

5
*Bartholomew v. YouTube, LLC*, 17 Cal. App. 5th 1217 (2017)........................................ 13

6
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007 ................................................. 4

7
*Blumenthal v. Drudge*, 992 F. Supp. 44, 51 (D.D.C. 1998) ............................................... 6

8
*Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106(1999)......................... 19

9
*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003)..................................... 5

10
*Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir.

11
    2008).................................................................................................................................. 6

12
*Christian Research Institute v. Alnor*, 148 Cal. App. 4th 71 (2007)................................... 11

13
*City of Cotati v. Cashman*, 29 Cal. 4th 69 (2002) ........................................................... 16

14
*Demetriades v. Yelp, Inc.*, 228 Cal. App. 4th 294 2014) ................................................. 18

15
*Enhanced Athlete LLC v. Google, LLC*, 479 F. Supp. 3d 824 (N.D. Cal. 2020) ................ 10

16
*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157 (9th Cir. 2008
    ......................................................................................................................................... 5

17
*Ferlauto v. Hamsher,* 74 Cal.App.4th 1394 (1999) ........................................................ 14

18
*Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816(2002).......................................................... 7

19
*Gomez v. Campbell–Ewald Co.*, 768 F.3d 871 (9th Cir. 2014) ......................................... 7

20
*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.,* 742 F.3d 414 (9th Cir. 2014) .. 17

21
*Hayes v. Facebook*, Civ. No. 19-cv-02106-TSH, 2019 WL 5088805 (N.D. Cal. Aug. 15, 2019)....... 14

22
*Jones v. Dirty World Ent. Recs. LLC*, 755 F.3d 398 (6th Cir. 2014) .................................. 6

23
*Jordan-Benel*, 859 F.3d at 1188................................................................................... 15

24
*Kahn v. Bower*, 232 Cal. App. 3d 1599, 1608 (1991) .................................................... 13

25
*Kimzey v. Yelp! Inc.*, 836 F.3d 1263, n.4 (9th Cir. 2016) ................................................ 6

26
*Kreiser v. Asset Mgmt. Grp., Inc.*, Civ. No. SACV 20-01794JVS(DFMx), 2021 WL 3579414, at *3

27
    (C.D. Cal. Apr. 23, 2021) ................................................................................................ 8

28


DIG
DHILLON LAW GROUP INC.

Opposition to Motions to Dismiss and Strike                    Case No.  5:21-cv-07385-VKD

*MacKinnon v. Logitech Inc.*, Civ. No. 15-cv-05231-TEH, 2016 WL 2897661, at *4 (N.D. Cal. May 8, 2016) ................................................................................................................................ 11

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) ............................................. 13

*Masson v. New Yorker Magazine, Inc.,* 960 F.2d 896 (9th Cir. 1992) ................................. 12

*Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045 (9th Cir. 2017) ...................... 7

Meta, *Stakcla, Inc. v. Facebook Inc.*, Civ. No. 19-cv-05849-PJH2019, WL 4738288 (N.D. Cal. Sept. 27, 2019) .......................................................................................................................... 17

*Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832 (9th Cir. 2001) ........................................ 13

*Mori Seiki USA, Inc. v. M.V. Alligator Triumph*, 990 F.2d 444 (9th Cir. 1993) ..................... 8

*Navellier v. Sletten*, 52 P.3d 703 (Cal. 2002) .................................................................. 15

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009) ............... 6

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ..................................................... 11

*Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, (1st Cir. 1992) .................. 15

*Reader's Digest Ass'n* and *Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896 (9th Cir. 1992) ........ 9

*Reader's Digest Ass'n. v. Superior Ct.* 37 Cal. 3d 244, (1984) ........................................... 11

*Rennie & Laughlin, Inc. v. Chrysler Corp.*, 242 F.2d 208 (9th Cir. 1957) ............................. 8

*Resolute Forest Products, Inc. v. Greenpeace International*, 302 F. Supp. 3d 1005 (N.D. Cal. 2017) 12

*Standing Committee on Discipline of U.S. Dist. Court for Cent. Dist. Of California v. Yagman,* 55 F.3d 1430 (9th Cir. 1995) ................................................................................................ 15

*Standing Committee on Discipline of U.S. Dist. Ct. v. Yagman*, 55 F.3d 1430 (9th Cir. 1995) ........... 14

*Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir. 1987) ................................................ 4

**Statutes**

C.C.P. § 425.16 ................................................................................................................ 17

C.C.P. § 425.17 ................................................................................................................ 18



## I.    INTRODUCTION

In response to Plaintiff John Stossel's ("Stossel") Complaint, Defendant Meta Platform, Inc. ("Meta") has filed a Motion to Dismiss and Special Motion to Strike Complaint under California's Anti-SLAPP Statute ("Motion"), which argues that Meta enjoys immunity under Section 230 of the Communications Decency Act, and that Stossel fails to plead a prima facie case of defamation. Both of these contentions fails on a Rule 12 standard,[1] as a matter of well-pled fact and law.

First, Section 230 has no application here because Meta is not being sued for being a passive "provider" of a platform, but rather for playing a direct and active role in commissioning, jointly developing, and then amplifying speech defaming Stossel. Meta is also liable for the defamation published by Defendants Climate Feedback[2] and Science Feedback (the "Feedback Defendants") because Meta holds these defendants out to the world as its partners in "fact-checking," and is plausibly alleged to have conspired with them to defame Stossel. As such, Section 230(c)(1) does not shield Meta from liability. And while Meta's Motion wholly fails to address Section 230(c)(2), the Complaint's allegations soundly establish that Meta did not engage in good faith censorship of content that was obscene, lewd, violent, harassing, or otherwise objectionable. As such, Section 230 is inapplicable to this action.

In a desperate attempt to avoid this result, Meta takes positions that are inherently self-contradictory. For example: if Meta's fact-checks are not its own speech but instead "content created by third parties," as Meta claims (Motion at 7), then how can those same fact-checks also be Meta's own "speech in connection with an issue of public interest" for the purpose of an anti-SLAPP analysis? *Id.* at 21. More fundamentally, how can Meta argue with a straight face that its self-proclaimed "fact" checks are actually its own "protected opinion" and its "personal perspective about

---

[1] As Meta concedes, "[w]here, as here, 'an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated.'" Motion at 22 (citing *Planned Parenthood Fed'n of Am., Inc. v. Ctr. For Med. Progress,* 890 F.3d 828, 834 (9th Cir. 2018)).

[2] Stossel has recently learned that Climate Feedback is merely a website under Science Feedback's exclusive ownership and control. *See* Dkt. No. 43 at 2.

1  ambiguities" in user content? *Id*. at 2, 16. These contradictions show the logical failings in Meta's

2  arguments.

3        Regarding the merits of defamation, the Complaint plausibly alleges each of the elements of

4  that claim. Meta's arguments regarding falsity and malice merely serve to highlight factual disputes

5  that render dismissal wholly inappropriate on a Rule 12 or anti-SLAPP motion.

6        As Meta's legal defenses are unavailing and Stossel's Complaint clearly pleads sufficient facts

7  to withstand the requisite minimal merit standard, Stossel respectfully requests that the Motion be

8  denied in full.

9                    **II.    BACKGROUND**

10  **A. THE PARTIES**

11        As alleged in the Complaint, Plaintiff John Stossel is a well-respected, award-winning career

12  journalist and reporter who publishes weekly news videos on social media, primarily on the social

13  networking service Facebook, which is operated by Meta. Compl. ¶¶ 23-24. Defendant Science

14  Feedback is a French Association Déclarée and describes itself as a "a worldwide network of scientists

15  sorting fact from fiction in science based media coverage." *Id.* ¶ 25. Defendant Climate Feedback is

16  alleged to be a subsidiary of Science Feedback (*Id.* ¶ 26), though the record now confirms that it is

17  actually just a website exclusively owned and controlled by Science Feedback. Dkt. No. 43. at 2.

18        Meta contracts with the Feedback Defendants to "fact-check" content posted by Facebook

19  users. Compl. ¶ 108. All Defendants jointly developed the defamatory content that is at issue in this

20  case. *Id.* ¶ 107. For example: Meta commissions the fact-checking, and applies content, labels, and

21  other information developed by fact-checkers to its users' speech. *Id.* ¶ 27. Meta intends that viewers

22  read the fact-checkers' content before reading or sharing the content being fact-checked. *Id.* ¶ 34. Meta

23  takes action so that content with certain fact-checking ratings are viewed by significantly fewer

24  people. *Id.* ¶ 35. Meta also restricts pages and websites that share "misinformation." *Id.* ¶ 36.

25        Meta admits that it "developed a fact-checking program," "identifies potential misinformation

26  for fact-checkers to review and rate," and "has designed its platforms so that fact-checker ratings

27  appear next to content that the fact-checkers have reviewed and rated." Motion at 1, 3. Meta concedes

28  that it "work[s] with independent, third-party factchecking organizations . . . to identify, review and

2

1   take action on" allegedly objectionable content. Declaration of Molly M. Jennings ("Jennings Decl."),

2   Exh. 2 at 1. As a result, Meta was and is directly involved in developing the defamatory labels and

3   content affixed to Stossel's videos, including by commissioning the other Defendants to review,

4   evaluate, and judge user content, and by affixing the labels directly to user content. Compl. ¶ 108.

5   **B.  THE FIRE VIDEO**

6         On September 22, 2020, Stossel published on his Facebook page a short news video entitled

7   "Government Fueled Fires" (the "Fire Video"). Compl. ¶ 37. In the Fire Video, Stossel discussed the

8   forest fires that were ravaging California in 2020, and reported on several reasons cited by politicians,

9   scientists, and environmentalists as the cause of the fires. *Id.* ¶ 38. The Fire Video explored two causes

10  of forest fires: climate change, and the buildup of vegetation due to government policy. *Id.* ¶ 39. In the

11  Fire Video, Stossel repeatedly acknowledged that climate change plays a role in forest fires. *Id.* ¶ 40.

12  He cited data from the Western Regional Climate Center and stated that "climate change has made

13  things worse. California has warmed 3 degrees over 50 years." *Id.*

14        Shortly after Stossel published the Fire Video, Meta placed a label prominently over or below

15  the Fire Video, stating, "Missing Context. Independent fact-checkers say this information could

16  mislead people," under which was a button stating "See Why." *Id.* ¶ 45. A viewer is then directed to a

17  page on Climate Feedback's website (the "Verdict Page"), which states: "Claim – 'forest fires are

18  caused by poor management. Not by climate change.' Verdict: misleading" (the "Claim"). *Id.* ¶ 47. A

19  reasonable reader who clicked through the various prompts and read the Verdict Page would and did

20  understand Defendants to mean that Stossel had made the allegedly debunked claim. *Id.* ¶ 48. In

21  reality, not only is the "claim" contained nowhere in Stossel's Fire Video, but the video repeatedly

22  confirms the opposite: that climate change is one of cause of forest fires. *Id.* ¶ 49. Defendants flagged

23  Stossel's reporting as failing a "fact-check" and being "misleading" and "missing context," based on

24  their false attribution to Stossel of the statement, "climate change doesn't cause forest fires," a claim

25  that he never made. *Id.* ¶ 53. Stossel later learned that Defendants apparently had not even bothered to

26  watch his Fire Video before condemning it. *Id.* ¶ 58.

27

28

Opposition to Motions to Dismiss and Strike          Case No.  5:21-cv-07385-VKD

1   **C.  THE ALARMISM VIDEO**

2          On April 17, 2021, Stossel re-published on his Facebook page another video report he had

3   previously published in November 2019, entitled "Are We Doomed?" (the "Alarmism Video"). *Id.* ¶

4   78. This video questioned claims made by those who Stossel refers to as "environmental alarmists,"

5   including claims that hurricanes are getting stronger, that sea level rise poses a catastrophic threat, and

6   that humans will be unable to cope with the effects. *Id.* Shortly after the April 2021 re-publication of

7   the Alarmism Video, Meta placed a label prominently over the video, stating "Partly False

8   Information. Checked by independent fact-checkers," under which was a button stating "See Why." *Id.*

9   ¶ 83. If a user clicks through, she is directed to a page on Climate Feedback's website captioned

10  "[v]ideo promoted by John Stossel for Earth Day relies on incorrect and misleading claims about

11  climate change" (the "'Fact-Check' Page"). *Id.* ¶ 83. Yet the "Fact-Check" Page identified no false

12  facts in Stossel's report. *Id.* ¶ 86. Relying on its faulty conclusions about both of Stossel's video

13  reports, Meta has reduced all distribution of Stossel's video reporting, and has limited the number of

14  individuals who will see his content on Facebook. *Id.* ¶¶ 102-105.

15                             **III.    LEGAL STANDARDS**

16          To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to

17  relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim

18  is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

19  inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

20  (2009). When evaluating a Rule 12(b)(6) motion, the court "must presume all factual allegations of the

21  complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v.*

22  *City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). "Factual allegations must be enough to raise a

23  right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

24

25

26

27

28



Opposition to Motions to Dismiss and Strike                          Case No.  5:21-cv-07385-VKD

## IV.   ARGUMENT

## A.  STOSSEL HAS PLED A VIABLE DEFAMATION CLAIM

### 1.  Section 230 of the Communications Decency Act Does Not Bar Stossel's Claim

### a.  Section 230(c)(1) immunity does not apply because the alleged defamation was jointly developed by Meta

Section 230(c)(1) states that no "provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Courts have consistently refused to apply Section 230(c)(1) immunity to those who, like Meta, develop the complained-of content, even in part. "A website operator can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider. . . . But as to content that it creates itself, or is 'responsible, in whole or in part' for creating or developing, the website is also a content provider." *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162–63 (9th Cir. 2008). "[T]he fact that users are information content providers [did] not preclude Roommate from *also* being an information content provider by helping 'develop' at least 'in part' the information" at issue." *Id.* at 1165; *see also Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009) (discussing "those who cannot take advantage of subsection (c)(1), perhaps because they developed, even in part, the content at issue"); *see also Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003).

Stossel has alleged numerous facts establishing that Meta played an active role in developing the defamatory content in conjunction with the Feedback Defendants, thus precluding immunity under Section 230(c)(1*). See* Compl. ¶ 107 ("[a]ll Defendants jointly developed the defamatory content that is at issue in this case") and ¶¶ 27, 29–36, 107–114. Specifically: it is alleged that Meta contracts and works with the Feedback Defendants to fact-check content, and commissions the fact-checking. *Id.* ¶ 27. Meta also developed and defined the ratings and labels to be applied to fact-checked content, *see id.* ¶ 33, and applies the labels it developed to content it helps identify. *See id.* ¶ 34. These facts are drawn from the Facebook website. *See*, *e.g.*, *id.* ¶¶ 29–36.

Meta's own admissions further establish Meta as a co-developer of the defamatory content. Meta admits that it "identifies potential misinformation for fact-checkers to review and rate," and that it "has designed its platforms so that fact-checker ratings appear next to content that the fact-checkers have

reviewed and rated." Motion at 1. Meta also "work[s] with independent, third-party factchecking organizations . . . to identify, review and take action on" allegedly objectionable content. Jennings Decl., Exh. 2. These admissions are sufficient to establish, particularly under a Rule 12 standard, that Meta itself has contributed to the creation of the complained-of defamatory content. At a minimum, one could reasonably infer from these admissions that Meta had a significant role in the creation of such content. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (citation omitted)). As such, Stossel has pled a prima facie case that Meta is a developer of the at-issue defamation, and thus is thus not shielded by Section 230(c)(1).

To avoid this result, Meta cites several cases concerning "the exercise of a publisher's traditional editorial functions." Motion at 8. These cases are inapposite and easily distinguished. Meta cites the non-binding cases of *Jones v. Dirty World Ent. Recs. LLC*, 755 F.3d 398 (6th Cir. 2014) and *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009) to argue that Meta's exercise of editorial functions did not transform it into a content provider for purposes of Section 230(c)(1) immunity. Yet those cases merely held that "website operators [that] provided a forum for user posts, did not require users to violate the law as a condition of posting, did not compensate for the posting of actionable speech, [and] did not post actionable content themselves . . . were not responsible for the actionable speech that was displayed on their websites." *Jones*, 775 F.3d at 414 (citing *Nemet*, 591 F.3d at 256–57; *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671–72 (7th Cir. 2008)). *See* Motion at 8.

In stark contrast here, Meta is alleged to have commissioned the fact-checking reports, to have directly posted a portion of the offending content, and to have been a contributing author of the offending content. In light of these allegations, Meta bears "responsibility for what makes the displayed content illegal or actionable," as in *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269 n.4 (9th Cir. 2016), another case cited by Meta. *Id.* at 1269 ("[A] website may lose immunity under the CDA by making a material contribution to the creation or development of content.")

Meta argues that merely paying a separate entity to produce actionable content does not strip a provider of its immunity under Section 230(c)(1). *See* Motion at 9 (citing *Blumenthal v. Drudge*, 992 F. Supp. 44, 51-52 (D.D.C. 1998); *Ben Ezra, Weinstein, & Co. v. Am. Online*, 206 F.3d 980 (10th Cir.



Opposition to Motions to Dismiss and Strike                    Case No.  5:21-cv-07385-VKD

2000)). Unlike in *Blumenthal* and *Ben Ezra*, Stossel is not seeking to hold Meta liable merely because the defamatory speech it commissioned from the Feedback Defendants appeared on its platform. Instead, Meta adopted that speech as its own and added its defamatory fact-checking labels as a means of endorsing it.

Finally, Meta's assertion that it merely performed "automated display of content created by third parties" (Motion at 8) is disingenuous and belied by the facts alleged and the law. Patently, this case does not involve a platform's mechanical use of an "automated algorithm" or a rating tool, as in the cases cited by Meta. While Yelp's star rating system does "absolutely nothing to enhance the defamatory sting of the message beyond the words offered by the user," *Kimzey*, 836 F.3d at 1270, Stossel has alleged that Meta's conduct in identifying misleading content, working with the Feedback Defendants to create and develop defamatory speech, then adopting and endorsing the speech as its own, lies at the heart of its culpable conduct. Indeed, the very origination of the defamatory content stems from Meta's actions. Unlike in the eBay case, the Court can reasonably find, based on the allegations pled, that Meta is not "simply compiling false and/or misleading content created by" the Feedback Defendants but rather is participating in the creation of that content in a meaningful way. *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 834 (2002).

Thus, in light of the Complaint's allegations and the inapplicability of Meta's cited law to this case, no Section 230(c)(1) immunity applies because the defamation at issue is alleged to be Meta's own and content that Meta jointly developed. Immunity is additionally inapplicable in light of the Complaint's agency allegations, as discussed next.

   **b. Section 230(c)(1) immunity does not apply because the alleged defamation is attributable to Meta**

The Complaint sufficiently alleges that Science Feedback and Climate Feedback acted as Meta's agents when defaming Stossel, and also conspired to defame Stossel.

An agency relationship may be created through actual or apparent authority, *see Gomez v. Campbell–Ewald Co.*, 768 F.3d 871, 878 (9th Cir. 2014), and "[w]hether an agency relationship exists also depends on the level of control a principal exerts over the agent." *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1055 (9th Cir. 2017). The existence of agency is question of fact. *See*

*Mori Seiki USA, Inc. v. M.V. Alligator Triumph*, 990 F.2d 444, 451 (9th Cir. 1993). And "[i]t is well-established that questions of fact cannot be resolved or determined on a motion to dismiss for failure to state a claim upon which relief can be granted." *Rennie & Laughlin, Inc. v. Chrysler Corp.*, 242 F.2d 208, 212 (9th Cir. 1957). As such, and in light of the facts alleged, questions of agency should survive Meta's motion to dismiss.

Meta's curious assertion that Stossel makes only a "bare legal conclusion" regarding agency is belied by a plain reading of the Complaint. Meta relies on cases in which the court rejected naked assertions of an agency relationship without any accompanying factual allegations. *See* Motion at 10–11. In one case, the court explained that a plaintiff must allege "sufficient facts to support a reasonable inference that an agency relationship existed," but need not allege "the precise details of the agency relationship . . . to survive a motion to dismiss." *Kreiser v. Asset Mgmt. Grp., Inc.*, Civ. No. SACV 20-01794JVS(DFMx), 2021 WL 3579414, at *3 (C.D. Cal. Apr. 23, 2021).

Here, Stossel has alleged that the defamatory statements made about him by the Feedback Defendants were made as part of the actual or ostensible agency relationship between the Feedback Defendants and Facebook, and that Facebook ratified the Feedback Defendants' defamation of Stossel. Compl. ¶ 109. The Complaint alleges that Meta had a contractual relationship with the Feedback Defendants, commissioned those Defendants to "review, evaluate, and judge user content," and worked with those Defendants to produce the defamatory content. *Id.* ¶¶ 107–108. Meta's public references to its fact-checking "partners" and its "partnerships" with fact-checking organizations, Jennings Decl., Ex. 2 at 1–2, establish that Meta held them out as authorized to act on Meta's behalf. Meta admits that it "identifies potential misinformation for fact-checkers to review and rate," and that it "designed its platforms so that fact-checker ratings appear next to content that the fact-checkers have reviewed and rated." Motion at 1. Meta also "work[s] with independent, third-party factchecking organizations . . . to identify, review and take action on" allegedly objectionable content. Jennings Decl., Ex. 2 at 1.

All of these allegations establish, for the purpose of a Rule 12 analysis, that the Feedback Defendants acted with actual and apparent authority when they posted "fact-checks" of Stossel's content, and that Meta exerted control over the Feedback Defendants.[3] Thus, agency is sufficiently

---

[3] If the Court is inclined to grant Meta's motion on the basis that Meta is not responsible for the Feedback Defendants' speech, Stossel respectfully requests leave to amend his Complaint to include

Opposition to Motions to Dismiss and Strike                                    Case No.  5:21-cv-07385-VKD

alleged, and Meta is liable for the actions of its agents, including their defamation. Meta's self-serving recitation that its fact-checking vendors act "independently" does not change this result.

In summary: Meta is not being sued for being a passive "provider" of a platform, but rather for having played a direct and active role in commissioning, developing, and amplifying the defamatory content. Meta is also liable for the defamation committed by its actual and/or ostensible agents, and for its role in conspiring with those defendants to defame Stossel. As such, Section 230(c)(1) immunity has no application.

### c. Meta has no immunity under CDA Section 230(c)(2)

In discussing CDA 230 immunity, Meta cites several cases regarding the editorial discretion of traditional publishers, like newspapers. *See, e.g.,* Motion at 22–23 (citing *Reader's Digest Ass'n* and *Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896 (9th Cir. 1992). This argument misunderstands (or intentionally obscures) the fact that Meta is not a traditional publisher, but rather an interactive computer service provider whose limited editorial protections, if any, stem from Section 230 subsection (c)(2), which Meta fails to address. Applying that statute to the facts alleged in the Complaint shows that Meta does not enjoy Section 230(c)(2) in this case.

Section (c)(2) states that no provider shall be liable for "any action voluntarily taken **in good faith** to restrict access to or availability of material that the provider or user considers to be **obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable**, whether or not such material is constitutionally protected." § 230(c)(2)(A) (emphases added). In its Conference Report for the bill that eventually became Section 230, the House Conference Committee explained that the purpose of Section 230's "Good Samaritan" provision was to further the "important federal policy of empowering parents to determine the contents of communications their children receive through interactive computer services." H.R. Conf. Rep. 104-458, at 194 (1996); *see also* Vanessa S. Browne-Barbour, *Losing Their License to Libel: Revisiting S 230 Immunity*, 30 Berkeley Tech. L.J. 1505, 1526–27 (2015) ("The Cox-Wyden Amendment, the foundation for what is now Section 230, stated that it 'sought to further First Amendment and e-commerce interests on the Internet while also promoting to

---

allegations regarding the statements by a Climate Feedback agent regarding the Alarmism Video, that "Facebook reached out to Climate Feedback to alert us about a video by John Stossel that is going insanely viral now" and that Climate Feedback is "working with Facebook to identify and counter misinformation." These statements provide further support for Stossel's allegation that Meta helped develop the defamatory speech at issue.

Opposition to Motions to Dismiss and Strike          Case No.  5:21-cv-07385-VKD

the protection of minors.'" (citing cases and legislative history)). Thus, Section 230's editorial immunities seek to protect the public from truly objectionable content, where censorship is done in good faith.

Meta fails to argue that its censorship of Stossel's videos was either done in "good faith," or that Stossel's content falls into any of the (c)(2) categories, such that Meta can enjoy editorial immunity. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009) (explaining that subsection (c)(2) provides an additional shield from liability to service providers that edit content, but only when such editorial decisions relate to the specific provisions set forth in the statute). First, the Complaint makes clear that there is nothing in the content of Stossel's videos that could possibly be considered lewd, violent, dangerous to children, or harmful in any other way for which the CDA was enacted.

Second (and though unnecessary given the unobjectionable nature of Stossel's video), Stossel has pled numerous facts showing that Meta did not act in good faith when it restricted access to his videos. The question of whether a content host acts in "good faith" is fact-intensive. *See Enhanced Athlete LLC v. Google, LLC*, 479 F. Supp. 3d 824, 831 (N.D. Cal. 2020). Good faith is determined subjectively, not objectively. *e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 608 (N.D. Ill. 2008). The Complaint alleges that Meta and its agents falsely labeled his Fire Video, sight unseen, which indicates a lack of good faith. The Complaint also alleges that Meta and its agents falsely declared the Alarmism Video to be "partly false" and containing "factual inaccuracies" when — as Defendants later were forced to concede — that video contained no false facts. These allegations would undermine any argument that Meta acted in good faith, had any such argument been made.

Meta cannot on one hand rightfully declare itself an information content provider under Section 230 (as it does in making its (c)(1) arguments), and on the other hand liken itself to a traditional journalistic outlet. The two are distinct. The defamatory act in question here was Meta's own involvement in developing and publishing its fact-checking label and speech, not an independent piece of journalism authored separately from Meta. For the reasons discussed above, no (c)(2) immunity applies.

### 2. Stossel Has Sufficiently Pled all Elements of His Defamation Claim

#### a. Stossel has adequately pled actual malice

Presuming for the sake of Meta's Motion that Stossel is a public figure or limited purpose public figure, to prove a defamation claim he must prove actual malice under the standard first articulated in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). "In this context, a defendant acts with 'actual malice' when publishing a knowingly false statement or where he 'entertained serious doubts as to [its] truth.'" *Christian Research Institute v. Alnor*, 148 Cal. App. 4th 71, 81 (2007) (quoting *Reader's Digest Ass'n. v. Superior Ct.* 37 Cal. 3d 244, 256 (1984)). Further, a plaintiff can establish actual malice by "showing that the defendant lacked reasonable ground for belief in the truth of the publication[.]" *MacKinnon v. Logitech Inc.*, Civ. No. 15-cv-05231-TEH, 2016 WL 2897661, at *4 (N.D. Cal. May 8, 2016).

Meta's characterization of Stossel's malice allegations as "threadbare" is belied by a plain reading of the Complaint. Stossel alleges that the Defendants attributed to him a claim he never made in the Fire Video (i.e., that climate change does not cause forest fires), and on this sole, faulty ground, Meta superimposed a "missing context" label on his report. Compl. ¶ 45. The Complaint alleges that Defendants lacked reasonable grounds for belief in the truth of their statements, including because they failed to identify any false facts in Stossel's report *Id.* ¶ 70, and did not bother even to watch the Fire Video before publishing their false attribution and label. *Id.* ¶¶ 58, 60. Indeed, Defendants — including via Climate Feedback scientist reviewers Stefan Doerr and Zeke Hausfather — conceded that their statements were *not* fairly applied to the Fire Video, *id.* ¶ 62, and further conceded that "if this [the label] is implying that we have reviewed the video, then this is clearly wrong, there's something wrong with the system." *Id.* ¶ 60–61. Yet despite all of this, after Stossel asked Defendants to correct the false attribution and label — including via a request he made to Climate Feedback editor Nikki Forrester — Defendants refused to correct their mistakes. *Id.* ¶¶ 67–68. These allegations amply establish malice, as Defendants published (and continue to publish) false statements, either knowing them to be false or lacking a reasonable ground for belief in their truth.

Regarding the Alarmism Video: the Complaint alleges that Defendants labeled it as "partly false," without identifying a single false fact in Stossel's report. *Id.* ¶¶ 85–86. Once again, Defendants — including via Climate Feedback scientist reviewer Patrick Brown — conceded that their label was

wrongly applied to Stossel's report by saying, *inter alia,* "I think it's wrong you were criticized" for reciting a true fact about observed trends in hurricane strength. *Id.* ¶ 92. Defendants further conceded that the sole basis for their "partly false" label was not falsity, but rather "a tonal thing…rather than specific 'facts' being 'wrong.'" *Id.* ¶¶ 92–95. Once again, Defendants failed to remove their false label, after being notified of its falsity. *Id.* ¶¶ 96–100. These allegations are sufficient to establish malice on a Rule 12 posture, as it is well-pled that Defendants published false statements, either knowing them to be false or lacking a reasonable ground for belief in their truth.

Meta's citation to *Resolute Forest Products, Inc. v. Greenpeace International*, 302 F. Supp. 3d 1005 (N.D. Cal. 2017) actually supports an actual malice finding here. In that case, the Complaint contained "at most, a formulaic recitation of the elements of a cause of action," and the "plausible inference from [plaintiff's] allegation is that Greenpeace made a mistake, not that it acted with actual malice." *Id.* at 1019 (internal citations omitted). By contrast, Stossel alleges specific facts showing why Meta knew or reasonably should have known that the labels it superimposed on Stossel's content were false, and that Meta kept those labels up even after learning more facts indicating their falsity. Further, the Complaint specifically identifies the direct publisher of the false labels (Meta), specifically identifies the direct publisher of the false attribution (Climate Feedback), specifically identifies the individuals within Defendant corporate entities who were responsible for generating the defamation, and contains ample allegations to establish why Meta is liable for the conduct of its Feedback Defendant agents. This showing goes above and beyond what is required by Rule 12 and the cases cited by Meta.

Meta cites *Masson v. New Yorker Magazine, Inc.,* 960 F.2d 896 (9th Cir. 1992) to claim that because "Meta relied on Climate Feedback's review and rating of the two videos it allegedly defamed," no actual malice against Meta can be shown. Motion at 14. This is inaccurate for two reasons: first, the Complaint does not allege "reliance" by Meta on its fact-checkers, but the exact opposite — namely, that "[Meta] was directly involved in developing the defamatory labels and content discussed herein," as discussed in detail above. Compl. ¶108. Second, the *Masson* defendant was entitled to rely on an investigation by the esteemed *New Yorker* magazine to evade an actual malice allegation, in light of that publication's "sterling reputation for accuracy and the existence of its fabled fact-checking department." *Masson,* 960 F.2d at 902. Suffice to say, Climate Feedback (which is nothing more than a "website" owned by Science Feedback) does not enjoy a similar reputation, and Meta's "reliance" on Climate

Opposition to Motions to Dismiss and Strike          Case No.  5:21-cv-07385-VKD

Feedback's investigations is therefore not a safe harbor against well-pled actual malice allegations. For all these reasons, Stossel sufficiently alleges actual malice against Meta, sufficient to overcome a Rule 12 Motion. *See Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 848 (9th Cir. 2001) (holding that "actual malice" or "intent to convey the defamatory impression" "cannot be properly disposed of by a motion to dismiss" in a case where "there ha[d] been no discovery").

**b. Stossel has sufficiently pled falsity, and no protected opinion defense applies**

Meta claims that there was nothing defamatory about attributing to a reporter an inaccurate claim that he never made. Yet "[f]alse attribution of statements to a person may constitute libel, if the falsity exposes that person to an injury contemplated by the [libel] statute." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (applying California law) (collecting cases). And if a "statement is reasonably susceptible of a defamatory interpretation . . . it is for the jury to decide whether a defamatory meaning was in fact conveyed to the listener or reader." *Kahn v. Bower*, 232 Cal. App. 3d 1599, 1608 (1991), *reh'g denied and opinion modified* (Sept. 6. 1991) (citations omitted).

Stossel has also pled sufficient facts for the jury to decide whether Defendants' statements about the "misleading" nature of his journalism are defamatory to him, as a career journalist. The statements accuse Stossel of "misleading" readers by making the outlandish claim that climate change is not a cause of forest fires (when in fact, Stossel reported the opposite), and of including false facts in his reporting. The Complaint alleges that these statements have caused irreparable damage to Stossel's professional reputation and business, including by causing existing viewers to believe that Stossel's reporting is biased and unfair. Compl. ¶ 106; p. 11, n.7 (video at 0:21 seconds: "SHAMEFUL John had all due respect for you till now! What happened to you!!?? Your NEWSWORTHY reporting was always neutral fair to both side[s of] the story was always on mark TILL NOW?!?!?...you['re] SC Fires story was SO RIGHT SIDED UNFAIR even FB tagged it."); *see also id.* ¶ 54 (summarizing negative feedback Stossel received). Unlike *Bartholomew v. YouTube, LLC*, 17 Cal. App. 5th 1217 (2017), in which the court held that a statement alleging a breach of contract (there, violation of YouTube's terms of service) is not defamatory per se, here the Defendants directly defamed the quality, accuracy, and integrity of Stossel's work. This is quintessential defamation. *See* Cal. Civ. Code §46 (publication that "tends directly to injure [plaintiff] in respect to his office, profession, trade or business…").



In a footnote, Meta weakly contends that the challenged statements aren't "of and concerning" Stossel. Motion at 17 n.11.  This is ridiculous: both videos were of Stossel's reporting, were posted on Stossel's Facebook page, included reference to his name in the bottom left corner, and were understood by readers to be about his reporting. Compl. ¶¶ 37, 45 (see graphic), 54, 78, 83 (see graphic). These statements referred personally to Stossel, both "by name [and] by clear implication." *Ferlauto v. Hamsher,* 74 Cal.App.4th 1394, 1404 (1999). This case is thus distinguishable from *Hayes v. Facebook*, Civ. No. 19-cv-02106-TSH, 2019 WL 5088805 (N.D. Cal. Aug. 15, 2019), in which Facebook blocked a link to plaintiff's business website and email address, without any mention of the plaintiff or any commentary about his work, where "no reasonable person would interpret those statements as being about Hayes personally." *Id.* at *7.

Meta disingenuously argues that Climate Feedback's fact check page about the Fire Video "is not attributable to Meta." Motion at 15. This argument fails, as it hinges on Meta's mischaracterization of the Complaint as alleging, "[t]he only action Meta is alleged to have taken is restating Climate Feedback's rating as a label and affixing that label to the Fire Video." Wrong: the Complaint clearly alleges that Meta's conduct includes jointly developing the fact-checks, then amplifying them by superimposing a label on Stossel's report and including a direct link to the fact-check. The reality, as pled, is that a Facebook user can *only* access Climate Feedback's fact check by clicking on the fact-check label affixed by Meta. As such, the fact check is directly attributable to Meta. Further and as discussed above, Meta is responsible for the speech of its agents, including Climate Feedback. The same analysis applies to Meta's identical attribution argument regarding the Alarmism Video.

Meta's next argument — that its supposed fact check is actually "[a] statement of opinion [that is] based on fully disclosed facts," Motion at 16 (citing *Standing Committee on Discipline of U.S. Dist. Ct. v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995)) — is concerning. Are Meta's "fact-checks" supposed to be verifications of fact, as Meta tells the public, or simply opinions? Meta would like the answer to depend on what is convenient for Meta at the time the classification is made. From an equitable standpoint, Meta should be estopped from making a "protected opinion" defense when it announces to the world that its labels are based in fact.

Regardless of the equities, the law precludes Meta's "protected opinion" defense because opinions are only protected if they are based on fully disclosed, *true* facts. *See Standing Committee on*

*Discipline of U.S. Dist. Court for Cent. Dist. Of California v. Yagman,* 55 F.3d 1430, 1439 (9th Cir. 1995) ("[a] statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning"). Here, the Complaint alleges that Meta's so-called opinion was based on facts that themselves were inaccurate: its "misleading" label was based on Climate Feedback's inaccurate assertion that Stossel had said something he did not, and Meta's "partly false" label was based on Climate Feedback's inaccurate assertion that the Alarmism Video contained "factual inaccuracies." Compl. ¶ 84 (see graphic).

Meta next argues that its statements were "not capable of verification or refutation by means of objective proof," citing *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 n.7 (1st Cir. 1992). Of course they are: whether or not Stossel made a claim that rendered his Fire Video "misleading," and whether his Alarmism Video contained "factual inaccuracies," are capable of verification — indeed, Meta itself concedes that its fact-checking focuses on "provably false claims" and that fact-checkers will "review content, check its facts, and rate its accuracy." Compl. ¶¶ 30–32. This is wholly distinguishable from *Phantom Touring,* where the First Circuit determined that a description of a play as a "rip-off, a fraud, a scandal, a snake-oil job" was subject to multiple interpretations.  For all of the foregoing reasons, the Complaint amply alleges the elements of Stossel's defamation claim.

## B.  THE COURT SHOULD DENY META'S ANTI-SLAPP MOTION

### 1.  Legal Standards

To prevail on an anti-SLAPP motion to strike, "[s]ection 425.16 posits [] a two-step process for determining whether an action is a SLAPP." *Navellier v. Sletten*, 52 P.3d 703, 708 (Cal. 2002). "First the court decides whether the defendant has made a **threshold** showing that the challenged cause of action is one arising from protected activity." *Id.* (emphasis added). "A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)." *Id.* "If the court finds that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim." *Id.*

With respect to the first prong, section 425.16(e)(4) notes that "the defendant must first make a prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of petition or free speech." *Jordan-Benel*, 859 F.3d at 1188. An "act in furtherance" includes, among

15

1   other things, "conduct in furtherance of the exercise of the constitutional right of petition or the

2   constitutional right of free speech in connection with a public issue or an issue of public interest." Cal.

3   Code Civ. Proc. § 425.16(e)(4). Courts determine whether a defendant has met this burden by asking

4   two questions: (1) from what conduct does the claim arise; and (2) is that conduct in furtherance of the

5   rights of petition or free speech. *Jordan-Benel*, 859 F.3d at 1190.

6       For purposes of anti-SLAPP, "the conduct from which a claim arises is the conduct that

7   constitutes the specific act of wrongdoing challenged by the plaintiff." *Jordan-Benel, Id.* at 1191; *see*

8   *also Renewable Res. Coal., Inc. v. Pebble Mines Corp.*, 218 Cal. App. 4th 384, 387 (2013) ("[T]he

9   gravamen of an action is the allegedly wrongful and injury-producing conduct that provides the

10  foundation for the claims"). "Even if a defendant engages in free speech activity that is relevant to a

11  claim, that does not necessarily mean such activity is the basis for the claim." *Jordan-Benel*, 859 F.3d

12  at 1190. California's Supreme Court has explained, "that a cause of action arguably may have been

13  'triggered' by protected activity does not entail that it is one arising from such . . .. [T]he critical

14  consideration is whether the cause of action is based on the defendant's protected free speech . . ."

15  *Navellier*, 29 Cal. 4th at 89; *see also City of Cotati v. Cashman*, 29 Cal. 4th 69, 78 (2002).

16      In *Jordan-Benel*, for example, the Ninth Circuit held that California's anti-SLAPP statute did

17  not apply to a contract claim involving the defendant movie studio's production of *The Purge* films.

18  859 F.3d at 1192–93. There, the plaintiff alleged that the defendant stole the plaintiff's idea for the

19  series without compensating the plaintiff, in breach of the parties' implied contract. *Id.* at 1191. The

20  defendant invoked California's anti-SLAPP statute because the claim rested on the allegation that the

21  defendant released cinematic productions, a canonical example of free expression. *Id.* at 1191. In

22  ruling for the plaintiff, the Ninth Circuit concluded that the defendant's alleged "specific act of

23  wrongdoing" was a plain old failure to pay, not the defendant's creation of the films. *Id.* In fact, the

24  plaintiff "desperately wanted the film to be made." *Id.* Accordingly, the anti-SLAPP statute did not

25  apply to the plaintiff's claim.

26      **2.   Meta Can Only Seek Shelter Under the anti-SLAPP Statute If It Engaged in Speech**

27      The many internal contradictions in Meta's Motion come to a head in its anti-SLAPP

28  argument. In arguing Section 230 immunity, Meta took the position that its fact-check labeling process

Opposition to Motions to Dismiss and Strike                    Case No.  5:21-cv-07385-VKD

1    is not really "speech," but is instead akin to a Google algorithm or an automated Yelp star review

2    system, and Meta also argued that any speech that did occur was not its own, but instead "content

3    created by third parties." If these arguments are credited, then Meta's anti-SLAPP argument is

4    doomed, as the statute only targets "the valid exercise [by Meta] of the constitutional rights of freedom

5    of speech and petition." C.C.P. § 425.16.

6        Pivoting from its prior claims, as convenient to its anti-SLAPP analysis, Meta now argues that

7    its "editorial decision" to affix fact check labels is protected conduct. Motion at 20–21. Meta cites

8    *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.,* 742 F.3d 414 (9th Cir. 2014), in

9    which the plaintiff challenged CNN's decision to publish news videos without closed captions, and the

10   plaintiff sought an injunction that would require CNN to adopt closed captions for every news video

11   on its website. *Id.* at 423. As such, the "principal thrust or gravamen" of the lawsuit was "to change the

12   way CNN has chosen to report and deliver that news content by imposing a site-wide captioning

13   requirement on CNN.com," and the court held that in bringing the lawsuit, plaintiff "targets conduct

14   that advances and assists CNN in exercising its protected right to report the news." *Id.* By contrast

15   here, Stossel's lawsuit does not target, or seek an injunction to stop or change Meta's fact-checking

16   process. This case is not about Meta's "protected right to report the news," but instead arises out of

17   false and defamatory statements made about his reporting. Meta's first anti-SLAPP prong 1 argument

18   fails for this reason.

19       Second, Meta argues that the process of fact checking, writ large, is "an issue of public

20   interest." Motion at 21. This argument similarly fails because again, the specific act of wrongdoing

21   challenged by Stossel is not Meta's use of a fact-checking process or its ability to "police the integrity

22   of its platform" (Motion at 21), but rather false statements Meta made about him. The sole case cited

23   by Meta, *Stackla, Inc. v. Facebook Inc.*, Civ. No. 19-cv-05849-PJH2019, WL 4738288 (N.D. Cal.

24   Sept. 27, 2019) concerns an application for preliminary injunction and does not address what

25   constitutes "public interest" for the separate purpose of an anti-SLAPP analysis.

26       Moreover, if Meta has indeed been sued in connection with its fact-checking process, as it

27   claims, then an anti-SLAPP argument is precluded by C.C.P. § 425.17(c), which sets forth a

28   commercial exception to protected speech. Under that exception, the anti-SLAPP statute "does not

17

1  apply to any cause of action brought against a person primarily engaged in the business of selling or

2  leasing goods or services" if "(1)…the statement or conduct was made in the course of delivering the

3  person's goods or services," and "(2) [t]he intended audience is an actual or potential buyer or

4  customer…" C.C.P. § 425.17(c).

5      Applied here: Meta is a multinational technology company that provides an online social

6  networking site, Facebook. Compl. ¶ 24. Meta provides its fact-checking process in the course of

7  delivering its social networking product to users, for the purpose of assuring readers that the content

8  on its platform is reliable. *Id.* ¶¶ 29–36. Meta's use of its fact-checking process to influence its users'

9  opinions about the integrity of its product (Facebook) is subject to the anti-SLAPP statute's

10 commercial exception. *See Demetriades v. Yelp, Inc.*, 228 Cal. App. 4th 294, 310 (2014) ("Yelp's

11 statements about its review filter—as opposed to the content of the reviews themselves—are

12 commercial speech about the quality of its product (the reliability of its review filter) intended to reach

13 third parties to induce them to engage in a commercial transaction (patronizing Yelp's Web site, which

14 patronage induces businesses on Yelp to purchase advertising)."). As such, if the Court accepts Meta's

15 arguments regarding the gravamen of this lawsuit being about a fact-checking process (arguments

16 which Stossel contends are incorrect as a matter of law), then the anti-SLAPP statute will not apply in

17 this case.

18      Finally, Meta argues that online discourse of the topic of climate change qualifies as a matter

19 of public interest. Motion at 22. This is the only argument with intellectual integrity, and Stossel

20 agrees that speech about climate change satisfies Prong 1 of the anti-SLAPP statute. The Complaint

21 alleges that Meta engaged in such speech when it made false statements about his climate change

22 video reports. On this ground, and only this ground, Stossel concedes that a prong 1 showing has been

23 made. However, the anti-SLAPP motion must be denied because the allegations of Stossel's

24 Complaint easily meet his minimal merit standard on a Rule 12 motion, as discussed above and next.

25  **3.  Stossel Has Demonstrated a Probability of Success on the Merits Under the Second**

26      **Anti-SLAPP Prong**

27      Meta's anti-SLAPP motion must be denied because Stossel has demonstrated a likelihood of

28 success on the merits of his defamation claim under the second anti-SLAPP prong. Under the second

18

1  prong, the "plaintiff need only have 'stated and substantiated a legally sufficient claim.'" *Navellier*, 52

2  P.3d at 708 (quoting *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1123 (1999)).

3  "Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and

4  supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence

5  submitted by the plaintiff is credited.'" *Id.* (internal citations omitted). Stossel has presented sufficient

6  facts on his defamation claim so as to sustain a favorable judgment, and has therefore plead a plausible

7  action under the FRCP 12(b)(6) standard. As such, Meta's anti-SLAPP Motion should be denied.

8                                         **V.    CONCLUSION**

9         For the foregoing reasons, Plaintiff John Stossel respectfully requests that the Court deny

10  Meta's Motion to Dismiss and Anti-SLAPP Motion, in full. If the Court grants Meta's Motion in any

11  part, Mr. Stossel asks the Court for leave to amend to cure any pleading deficiencies.

12

13  Respectfully submitted,

14  Date: January 11, 2022                     DHILLON LAW GROUP INC.

15                                    By: /s/ Krista L. Baughman _____

16                                         KRISTA L. BAUGHMAN
                                            HARMEET K. DHILLON
17                                         JESSE FRANKLIN-MURDOCK
                                            DHILLON LAW GROUP INC.
18                                         177 Post Street, Suite 700
                                            San Francisco, California 94108
19                                         Telephone: (415) 433-1700
                                            Attorneys for Plaintiff John Stossel
20

21

22

23

24

25

26

27

28



Opposition to Motions to Dismiss and Strike          Case No.  5:21-cv-07385-VKD

**CERTIFICATE OF SERVICE**

I, Krista L. Baughman, hereby certify that on January 11, 2022, I electronically filed the above document with the Clerk of the Court using CM/ECF, which will send electronic notification of such filing to all registered counsel.

Dated: January 11, 2022                    By:  /s/ Krista L. Baughman
                                                 Krista L. Baughman